IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL CHARLES SCHENA,<br><br>Defendant. | Case No. 1:25-CR-158 |

## **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

In August of 2024, Michael Charles Schena was in Peru, taking a vacation from his day job at the United States Department of State ("DOS"). While there, Schena texted with an individual who worked for the government of the People's Republic of China ("PRC"). This PRC handler directed Schena to a nearby rendezvous point: a hotel in Lima. When Schena walked into the lobby of that hotel, a man, whom Schena had never seen or met, approached him. The unidentified man asked, "Oh, you are Michael?" When Schena confirmed his identity, the unidentified man passed Schena an envelope and then walked away. In the envelope was $10,000 in U.S. currency and a white Apple iPhone 14. Schena's PRC handler instructed Schena to use only the white iPhone to communicate with him.

Over the next six months, Schena surreptitiously photographed at least eleven documents classified at the SECRET level from his workstation at the DOS. The classified documents covered a range of topics regarding the United States's diplomatic efforts abroad and the United States military's intelligence activities. Notably, some of these documents contained information obtained from human sources, the disclosure of which could cause deadly consequences for the sources and impede United States's ability to recruit and protect other sources. Once he had the

1

documents photographed, Schena used his white iPhone 14 to send the classified documents to at least one individual who he thought worked for the PRC government. Over the course of his ongoing relationship with the PRC government, he received at least $13,220.

In February 2025, Schena was caught red-handed when he was filmed taking photographs of classified documents at his workstation. When he was arrested and gave a voluntary interview, he initially rejected the idea that he had taken classified documents and denied any contact with his PRC handlers. Ultimately, FBI agents told Schena that had been filmed taking photographs of classified documents. The gig was up. Schena confessed that he planned on sending the classified documents to *two* individuals in the PRC government. And he admitted he knew the consequences of his actions. He told FBI agents, "***I am a traitor***."

Schena sold out his country by giving classified documents to a hostile foreign government. The United States recommends a term of imprisonment at the high-end of the guideline range— 87 months—which reflects Schena's betrayal of the United States when he systematically gathered and transmitted classified, national defense information to the PRC with the intent or reason to believe that the information was to be used to the injury of the United States or to the advantage of a foreign nation.

## BACKGROUND

### I.    Schena's Employment and Access to Classified Information

In 2007, Schena began his employment with the DOS as a Foreign Affairs Officer, serving as a South Caribbean Desk Officer in the Bureau of Western Hemisphere Affairs, located at DOS Headquarters in Washington, DC. ECF No. 52 ¶ 2. As a Foreign Affairs Officer, Schena's official duties included providing reporting, analysis, and policy recommendations for the DOS on matters relating to U.S. foreign affairs. ECF No. 38, Ex. A ¶ 4. Schena held an active TOP SECRET security clearance from the beginning of his employment until his arrest, excluding between

approximately 2018-2020. *Id.* In 2006, as part of his onboarding process into federal service, Schena executed a Classified Information Nondisclosure Agreement in which Schena acknowledged that any unauthorized disclosure, unauthorized retention, or negligent handling of classified information could cause damage or irreparable injury to the United States. *Id.* ¶¶ 8-9. He also swore not to divulge classified information. *Id.*

Schena worked from both home and his physical office located at the DOS's Washington, DC building. ECF No. 52 ¶ 7. While at home in Alexandria, Virginia, Schena could access information classified up to the Sensitive But Unclassified ("SBU") level from his DOS-issued laptop computer. *Id.* According to DOS's Foreign Affairs Manual, SBU information is "not classified for national security reasons, but [still] warrants/requires administrative control and protection from public or other unauthorized disclosure for other reasons," which includes law enforcement information, information illustrating or disclosing infrastructure protection vulnerabilities, and design and construction information related to diplomatic missions and General Service Administration (GSA) facilities. 12 FAM 540.

While at his DOS workstation, he had access to material classified up to the SECRET level. ECF No. 52 ¶ 7. By definition, unauthorized disclosure of information classified as SECRET could be expected to cause *serious damage* to the U.S.'s national security. *Id.* ¶ 3.

## II.    The PRC's Online Recruitment Method

For years, the PRC has taken efforts to identify, target, and task potential spies through online platforms, such as LinkedIn.[1] Through these platforms, PRC case officers can identify

---

[1] Strobbel, Warren, Landay, Jonathan, *Exclusive – U.S. Accuses China of "Super Aggressive" Spy Campaign on LinkedIn*, Reuters (last visited Aug. 26, 2025), http://reuters.com/article/ world/exclusive-us-accuses-china-of-super-aggressive-spy-campaign-on-linkedin-idUSKCN1LG16I/; Lucas, Ryan, *People Are Looking at Your LinkedIn Profile. They Might be*

clearance holders and communicate with potential human sources through direct message. And with today's technology, a PRC case officer can communicate, receive classified documents, and remit payments through encrypted applications. As a result, PRC case officers never need to meet their human sources in person or set foot on U.S. soil to run sources. Indeed, the FBI has created a website dedicated to informing citizens about this threat and has also published a short fictional film, The Nevernight Connection,[2] which was inspired by the case of a former CIA officer Kevin Mallory, who was prosecuted and convicted here in the Eastern District of Viriginia in 2018.[3] Schena's conduct follows this pattern of recruitment, development, and, ultimately, betrayal.

## III.    April-June 2022:  Schena Begins Selling Government Information to Purported Foreign Consultants

Schena's espionage began in at least April 2022, when he connected with multiple people he met online and unlawfully provided them with sensitive information for payment. *Id.* ¶ 8. For example, on May 18, 2022, an individual ("Platform User 1") who purported to work for an international consulting company, paid Schena $500 for photographed documents, notes, files, and other information; specifically, information of interest to the PRC. *Id.* ¶ 9. Schena continued to provide information to Platform User 1, and on June 19, 2022, Schena emailed text from a DOS document classified as SBU. *Id.* ¶ 10. Prior to sending the document, Schena removed some, but not all, SBU markings. In return for this unauthorized disclosure, Schena received an additional $500. *Id.* Eventually, when these actors realized Schena would provide them United States secrets, they increased their requests in both volume and sensitivity. Schena was eager to comply.

---

*Chinese    Spies.*, NPR (last visited Aug. 26, 2025), https://www.npr.org/2019/09/19/761962531/people-are-looking-at-your-linkedin-profile-they-might-be-chinese-spies

[2]*See*       https://www.fbi.gov/investigate/counterintelligence/the-china-threat/clearance-holders-targeted-on-social-media-nevernight-connection.

[3] Available at https://www.fbi.gov/video-repository/nevernight-connection-093020.mp4/view

IV.    **August 2024 through Arrest: Schena Gathered and Transmitted Classified Information Through Covert Means**

Prior to August 2024, Schena met two co-conspirators (referred to as Unindicted Co-Conspirator 1 ("UCC 1") and Unindicted Co-Conspirator 2 ("UCC 2")). Schena provided, and attempted to provide, classified information to UCC 1 and UCC 2 in exchange for money.

Put simply, Schena was a spy for the PRC. Schena believed both UCC 1 and UCC 2 worked for the PRC. ECF No. 52 ¶ 11. He was recruited and tasked through online platforms under the guise of doing "consulting" work. While Schena never met his handlers in person, it was readily apparent to anyone, let alone a seasoned Foreign Affairs Officer, that he was spying, not merely "consulting." Schena's PRC handler repeatedly tasked Schena to collect classified information on topics of particular interest to China and provided him cash and a "covert communication" device during a brush pass in Lima, Peru. He provided, or planned on providing, classified documents to his PRC handlers via electronic "dead drops." Schena even searched on Google, "spying for china." And, to both FBI agents during a voluntary interview and to the Court during his guilty plea, Schena admitted that he believed he was sending classified information to individuals working for the PRC government.

\* \* \* \* \*

In an event fit for a spy novel, in August 2024, UCC 1 directed Schena to go to a hotel in Lima, Peru, where Schena met with an unknown individual. *Id.* ¶ 12. During this encounter, the unknown individual handed Schena $10,000 cash and a white Apple iPhone 14, which was registered with a foreign telephone number. *Id.* At UCC 1's direction, Schena used this white Apple iPhone 14 as a covert communication device for Schena to image and transmit information without law enforcement detection. *Id.* Needless to say, Schena did not receive approval by anyone at DOS to image, store, or disseminate classified material with this Apple iPhone 14. *Id.*

Schena communicated with UCC 1 and UCC 2 through an encrypted text messaging application on his COVCOM device. When it came time to transmit classified information, Schena used different methods for communicating with his handlers. For UCC 1, Schena was given different URLs each time he wanted to pass classified information. Schena's phone history revealed that Schena accessed websites associated with UCC 1 as far back as November 2024 and as recently as January 2025. For UCC 2, Schena used the same website, with a username and password, to send material to UCC 2. A review of Schena's COVCOM showed that Schena accessed UCC 2's website numerous times in 2024 and most recently on February 15, 2025.

Schena also used the COVCOM to receive taskings from UCC 1 and UCC 2. ECF No. 52 ¶ 12. Schena maintained two accounts, one account on the COVCOM ("Encrypted Account 1") and one account on his personal phone ("Encrypted Account 2"). To avoid bringing the COVCOM to work, when UCC 1 or UCC 2 sent him taskings to Encrypted Account 1, Schena copied the taskings and used Encrypted Account 1 to send the taskings to Encrypted Account 2. Schena explained to the FBI that he could then access these taskings on his personal phone at work. These taskings included collecting information on specific topics of interest to the PRC, such as Taiwan and sanctions considerations. Indeed, one task was to collect "[e]verything about China or came from Beijing," which the PRC handler told Schena to do "every chance you get."

Further, Schena knew his handlers wanted classified information. In one message, a handler told Schena, "Don't worry about there's little new stuff available. Old stuff is good too if it's marked with 's'"—a familiar portion marking for "SECRET" to a veteran clearance holder like Schena. Schena later admitted to the FBI that he knew that "s" referenced SECRET documents. And Schena followed through on these tasks.

**A. October 2024: Schena Photographed and Transmitted Four SECRET Documents.**

On October 25, 2024, Schena accessed the DOS classified system and saved five visibly and properly marked SECRET documents to a folder on his classified system's desktop. ECF No. 52 ¶ 13. These documents also maintained the dissemination control NOFORN, which means the documents are not releasable to foreign nationals. Ex. A, Timothy Kootz August 2025 Decl. ("Kootz Aug. Decl.") ¶ 5.[4] Schena initially attempted to print the documents on October 29, 2024, but he was unable to map the printers. Undeterred, Schena photographed at least four of the five SECRET documents with the COVCOM—revealing the lengths Schena was willing to go to share classified information with China. ECF No. 52 ¶ 13. Schena then sent the four SECRET documents, which contained national defense information, to UCC 1 later that evening. *Id.*

**B. February 2025: Schena Photographed and Transmitted Seven SECRET Documents.**

Just a few months later, Schena was willing to spy again. His handlers were growing impatient, telling him that it had been weeks since his last transmission. On February 27, 2025, Schena again accessed the DOS classified system and opened five documents relating to the diplomatic relationship of the United States and containing national defense information. *Id.* ¶ 15. Schena also accessed two Department of Defense ("DOD") documents relating to United States Southern Command ("SOUTHCOM") and containing national defense information. *See* Ex. B, John. P. Dixson Decl. ("Dixson Decl."). All seven of these documents were visibly marked as SECRET. Schena displayed the documents on his computer monitor, turned his COVCOM's

---

[4] As described in more detail below, the government has attached unclassified declarations from individuals at DOS and DOD that explain the nature of the classified documents and the reasons they are properly classified.

camera feature on, and looked around his computer monitor to ensure no one was watching him. As shown below, Schena then proceeded to take photographs of the seven SECRET documents.



*Schena taking a photograph of a classified document while at his DOS desk on February 27, 2025 (redacted).*

Shortly after photographing these classified documents, Schena attempted to delete the photographs, which appeared to be an effort to put the photographs in the "deleted" folder of his iPhone instead of the camera roll. Afterward, Schena put down his COVCOM, retrieved his personal phone, and messaged UCC 1, "Send a link tonight" and messaged UCC 2, "Have stuff tonight" using Encrypted Account 2.

## V.    Defendant's Post Arrest Statements

On the evening of February 27, 2025, the FBI obtained search warrants and secured Schena's COVCOM device and other devices.  For the next few days, Schena received medical treatment.  *See* ECF No. 16 (Under Seal).  But on March 5, 2025, the FBI arrested Schena on a criminal complaint alleging a violation of 18 U.S.C. § 793(g).

That evening, Schena waived his Miranda rights and agreed to be interviewed by the FBI.  Ex. E, Defendant's Interview Video (Filed Under Seal).  During the first approximately fifty minutes of the interview, and despite warnings against false statements pursuant to 18 U.S.C. §1001, Schena lied repeatedly.  He denied taking photographs of classified material, denied knowing UCC 1 or UCC 2, and denied sending classified or SBU material to someone unauthorized to receive them.  Only after the FBI informed Schena about the surveillance video of his office did Schena mumble that he "got paid to send stuff," but he insisted he did not know who he was sending it to.  Ultimately, realizing he was caught, Schena unraveled and finally admitted that he was a traitor.

Schena admitted to being approached multiple times by multiple people on LinkedIn, including by UCC 1 and UCC 2, but claimed to not know their true names.  He stated that he met UCC 1 possibly after the pandemic and UCC 2 before the pandemic.  Schena also thought it was possible that UCC 1 and UCC 2 worked for the same organization.  Schena explained that he first started to give UCC 1 and UCC 2 "garbage"—a reference to Schena's own notes or old documents that he sent to UCC 1 and UCC 2.  But Schena confessed that his co-conspirators pushed "harder and harder for classified" material.  Although Schena initially refused, his hesitation was short lived; the UCCs promised him "a lot of money," so Schena said, "ok fine – I will do what I can."  He then collected and transmitted classified information using the communications platforms his PRC handlers provided.

9

Schena confirmed he received the COVCOM in Peru after being directed by UCC 1 to the hotel in Lima.  Schena explained that he would send taskings from Encrypted Account 1 on the COVCOM to Encrypted Account 2 on his personal phone to avoid bringing the COVCOM to work.  Schena asked UCC 1 and UCC 2 "many times" about their affiliation.  While UCC 1 and UCC 2 denied working for the PRC government and claimed to work for consulting companies, Schena nonetheless believed what commonsense told him: they worked for the PRC.

## VI.    Schena's Payments for His Espionage Work

As discussed above, Schena began selling U.S. government information to individuals online back in the spring of 2022.  Despite a thorough investigation, the government still does not have a full account of how much money Schena received for selling sensitive information.  Between at least May 2023 through February 2025, Schena received over 90 transfers through online payment platforms in his wife's name.  The total amount was over $37,000.  The payments ranged in amount from $122 to $1,000 dollars and rarely repeated the same payment amount.  Nine of these payments, made from January 2023 to March 2023, included a reference to the name UCC 1 provided Schena and totaled $3,220.  Based on a review of evidence in this case, these payments do *not* appear to be related to his legitimate sources of income.  Instead, they are consistent with payments for his espionage work, similar to what is described above.

In the lead up to February 27, 2025, Schena was not told how much he would be paid for the classified documents.  Schena told the FBI that the money UCC 1 and UCC 2 sent Schena was not constant and sometimes UCC 1 would send money unrelated to the work, such as "good will" money when Schena was sick.

**VII.    The Documents Schena Disclosed to UCC 1 and UCC 2 Contained National Defense Information**

Attached to this sentencing memorandum are three declarations that discuss the potential harm caused by the unauthorized disclosure of the classified documents gathered, imaged, and transmitted (or preparation thereof) by Schena.  If the Court would like to view the underlying classified documents, the government can provide the documents through the Classified Information Security Officer.  In all, Schena admitted to gathering and sending, or attempting to send, eleven classified documents.  In October 2024, he sent four SECRET documents from DOS. And in February 2025, he attempted to send seven documents: five from DOS and two from DOD.

**A.  October 2024 – DOS Documents**

In October 2024, Schena imaged and transmitted four SECRET documents containing national defense information.  *See* Kootz Aug. Decl.  Timothy Kootz, who is the Deputy Assistant Secretary for the office of Shared Knowledge Services for the Bureau of Administration at DOS submitted a declaration regarding the documents Schena imaged and transmitted in October 2024. DAS Kootz is an Original Classification Authority ("OCA") for DOS, meaning that he is authorized to classify or declassify material. *Id*. ¶ 1.  The documents imaged by Schena in October 2024 "contained sensitive diplomatic, informational, military, and economic assessments of regional strategic competitors and foreign countries in the Indo-Pacific region of vital interest to the United States." *Id.* ¶ 7.  DAS Kootz went on to explain that "unauthorized disclosure of these records provides nation-state adversaries a roadmap to seriously harm United States diplomatic, informational, military, and economic engagement." *Id.*

11

### B. February 2025 – DOD Documents

Then, in February 2025, Schena again gathered classified documents containing national defense information, but this time he methodically gathered and imaged more documents—seven on this occasion—that originated from both DOD and DOS.

John P. Dixson, who is the Director for Defense Intelligence (Counterintelligence, Law Enforcement, and Security), where he serves as the principal advisor to the Under Secretary of Defense for Intelligence and Security for matters related to DOD's security enterprise, executed a declaration regarding the two DOD documents imaged by Schena in February 2025. *See* Dixson Decl. ¶ 1. DDI Dixson serves as an Original Classification Authority for DOD. *Id.* ¶ 2. The two DOD documents originated from SOUTHCOM,[5] which is "responsible for providing contingency planning, operations, and security cooperation" in Central America, South America, and the Caribbean and "responsible for the force protection of U.S. military resources at these locations." Dixson Decl. ¶ 4.

The documents imaged and gathered by Schena contain information obtained by U.S. intelligence officers and human sources, including indicators of their identities, missions, and organizations. *Id.* ¶ 8. As DDI Dixson explained, DOD's "ability to further national security is predicated on our ability to secure information obtained from human and technical sources from exposure," but "[w]hen human sources are compromised, it erodes [DOD's] ability to recruit sources who can provide invaluable insight into the intentions of adversaries." *Id.* ¶ 8. DDI Dixson stated, "[t]he harms of the alleged disclosures are not yet quantifiable, but the Department's ability

---

[5] DDI Dixson's declaration discussed two SOUTHCOM documents and one CYBERCOM document. The CYBERCOM document was one of the documents Schena accessed in October 2024, along with the four DOS documents he ultimately retained images of on his COVCOM. The CYBERCOM document, however, was not found on Schena's COVCOM at the time FBI seized his devices.

to conduct intelligence operations will certainly be impacted. The United States has an enduring need to meet and mitigate its most pressing national security challenges; including peer and near-peer competitors, and these criminal disclosures have undoubtedly harmed the Department of Defense's ability do this." *Id.* ¶ 10.

### C. February 2025 – DOS Documents

DAS Kootz submitted a separate declaration regarding the five documents Schena imaged in February 2025. *See* Ex. C, Timothy Kootz March 2025 Decl. ("Kootz March Decl."). As DAS Kootz explained, the documents contain communications from U.S. embassies, the U.S. government's assessments of foreign governments, details of sensitive discussions with foreign government interlocutors, and details of the U.S. foreign policy goals in various countries. *Id.* ¶ 5. Further, the documents contain information that foreign governments had shared with the United States with an expectation of confidentiality, including the confidentiality of foreign sources within those governments. *Id.* When such information is disclosed, "foreign partners are less likely to share sensitive information with our diplomats, depriving the United States of critical information germane to our foreign policy." *Id.* ¶ 11. Additionally, these documents contain U.S. foreign policy information that if disclosed would provide "foreign adversaries an advantage in the geopolitical sphere to counter, disrupt, or blunt U.S. foreign activities." *Id.* In turn, the "lost foreign relations opportunities, foreign government information not passed, and advancements at our expense of our foreign adversaries could cause serious damage to U.S. national security." *Id.* ¶ 12.

## VIII. Procedural Background

On March 3, 2025, Schena, who was then employed by the Department of State ("DOS"), was charged by complaint with one count of conspiracy to gather, transmit, or lose defense information, in violation of 18 U.S.C. § 793(g). ECF No. 2. On March 5, 2025, the FBI arrested Schena. ECF No. 8. On June 3, 2025, Schena appeared before this Court and entered a plea of

guilty to a Criminal Information charging Schena with one count of conspiracy to gather, transmit, or lose defense information, in violation of 18 U.S.C. §793(g).  ECF No. 50.  Sentencing is currently scheduled for September 4, 2025. *Id.*

## ANALYSIS

### I.   **Legal Standard.**

The standards governing sentencing are well established. This Court must consult the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") as well as the factors set forth in 18 U.S.C. § 3553(a) when making a sentencing decision, though the Sentencing Guidelines are purely advisory.  *See United States v. Booker*, 543 U.S. 220 (2005).  The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of Schena; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense.  Ultimately, the sentence imposed must meet a standard of reasonableness.  *See Booker*, 543 U.S. at 260-61.

## II.    Sentencing Guidelines.

### A.    Plea Agreement.

Under the terms of the plea agreement, the parties agreed that the following provisions of

the Sentencing Guidelines applied to the calculation of Schena's sentence:

| Guideline(s) | Description | Offense Level |
|---|---|---|
| § 2M3.2(a)(2) | Base Offense Level (Gathering national defense information) (SECRET) | 30 |
| § 3B1.3 | Abuse of Position of Trust | +2 |
| §§ 3E1.1(a), (b) | Acceptance of Responsibility[6] | -3 |
| § 4C1.1 | Adjust for Certain Zero-Point Offenders | -2 |
| | **Total Offense Level** | **27** |

ECF No. 51 at 3-4.

The parties did not agree to any further sentencing issues related to the Sentencing

Guidelines or the factors listed in 18 U.S.C. § 3553(a).

### A.    The Presentence Investigation Report Correctly Calculated the Total Offense Level at 27 points.

The Government agrees with the PSR that Sentencing Guidelines § 2M3.2 applies to a

conviction of 18 U.S.C. § 793(g). *See* Presentence Investigation Report ("PSR") ¶ 54. Schena did

not merely retain the material classified at the SECRET level and contained national defense

information; rather, Schena transmitted multiple classified documents containing national defense

information with reason to believe that it could be used to the injury of the United States or the

advantage of a foreign nation. *See* Application Note 2, USSG § 2M3.3. Accordingly, the base

offense level is 30. *Id.*

---

[6] Schena qualifies for a two-level decrease in his offense level under § 3E1.1(a) because he timely notified the United States of his intention to enter a plea of guilty. Because his offense level prior to the operation of § 3E1.1(a) is a level 16 or greater, Schena qualifies for an additional one-point reduction under § 3E1.1(b). Pursuant to the plea agreement, the United States moves for the additional one-level decrease for a total decrease of three points for acceptance of responsibility.

The Government also agrees with the two-level upward adjustment the PSR recommends (and the parties agreed to in the plea agreement) regarding Schena's abuse of his position of trust. As noted above, Schena was a Foreign Affairs Officer, which required him to have access to classified information in order to fulfil his official duties, which included providing reporting, analysis, and policy recommendations for the DOS on matters relating to U.S. foreign affairs. Ex. D, Erin Smart Decl. ("Smart Decl.") ¶ 4.  His access to classified information containing national defense information, which he was given in order to perform his job at DOS, significantly facilitated the commission of his offenses.  Therefore, Guidelines § 3B1.3 applies and the offense level should be increased by two more levels to 32. *See* PSR ¶ 57; *see also United States v. Ford*, 288 F. App'x 54, 60-61 (4th Cir. 2008) (per curiam) (upholding application of § 3B1.3 to TS/SCI clearance holder convicted of violating 18 U.S.C. § 793, stating the defendant "held a top secret security clearance as an employee of the National Security Agency and he was able to remove classified documents from his office without detection by his supervisors. [The defendant's] actions exposed classified information to discovery by a person without a security clearance and created a potential for serious harm to our nation's security"); *United States v. Mallory*, Case No. 1:17-cr-154, Dkt. 280, at 16 (E.D. Va. July 30, 2019) (Ellis, J.) (finding that an abuse of trust enhancement can apply even after Mallory left his employment noting that the defendant "only retained the information because of the position of trust that he held at the time that he was employed by the agency").

Lastly, the Government agrees with the PSR recommendations regarding reductions to the applicable offense level.  Schena should receive a three-level downward adjustment for acceptance of responsibility under Guidelines §§ 3E1.1(a), (b).  PSR ¶ 61.  And Schena appears to meet the criteria under Guidelines § 4C1.1(a), warranting an additional two-level downward adjustment.

16

In sum, Schena's total Guidelines offense level is 27, *see* PSR ¶ 119, and his criminal history category is I, *see id.* ¶ 120.  Accordingly, Schena's Guideline range is 70 to 87 months' imprisonment.  *See id.* ¶ 120.

## III.    Statutory Analysis and Recommendation.

Based on the § 3553(a) factors, the United States recommends a sentence of imprisonment of 87 months, a term of supervised release of three years, and the imposition of the special conditions of supervised release listed in the PSR.

### 1.   Nature and Circumstances of the Offense

Schena's espionage was extraordinarily serious.  Among the various espionage statutes, 18 U.S.C. § 793 prohibits a range of conduct that varies in severity.  On one end of the spectrum, the statute prohibits simply unlawfully retaining certain information; on the other, the statute prohibits transmitting that information to others.  Schena's conviction for conspiracy to transmit—and his successful transmission of—classified information falls into this latter category.  Transmission of classified material warrants a more significant punishment in light of the increased risk it presents to the nation's security.  As a result, the government recommends a sentence at the high end of the range to reflect that Schena's conduct falls into the most severe conduct within § 793.  *See United States v. Ford,* 288 F. App'x 54, 61 (4th Cir. 2008) (affirming sentencing where court recognized that the active transmission of classified national defense information should be punished more harshly than simple retention).

Here, Schena's violations of the Espionage Act consisted of not only systematically imaging and retaining classified, national defense information on an unauthorized device, but also, on at least one occasion, transmitting four classified documents containing national defense information related to the "sensitive diplomatic, informational, military, and economic assessments of regional strategic competitors and foreign countries in the Indo-Pacific region."  Kootz August

2025 Decl. ¶ 7.  But for the FBI's critical seizure of Schena's COVCOM's device on the evening of February 27, 2025, Schena planned to transmit *seven* additional documents classified at the SECRET level and containing national defense information controlled by both DOD and DOS.

The documents from DOD contained information collected from human sources.  The unauthorized disclosure of information collected from human sources poses a serious risk that individuals may be identified by a hostile actor.  Dixson Decl. ¶ 8-10.  Similarly, when an individual like Schena discloses classified information about human sources, it inhibits the United States Government's ability to recruit and retain other human sources.  This, in turn, undermines a key feature of the government's intelligence collection efforts.  *Id.*

According to Schena, he betrayed his country for a simple reason: money.  As early as April 2022, Schena was willing to sell government information to individuals for small sums of money.  And when it came to classified information, it appears that Schena did not care how much he got paid, as long as he got something.  As he explained in his interview with the FBI, on February 27, 2025, when Schena intended to send seven classified documents, he claimed not to know how much money he would receive in exchange for their dissemination.  Put another way, Schena was willing to sacrifice his country's security for an unknown sum of money.

Schena also took efforts to conceal his activities with UCC 1 and UCC 2 through not only the COVCOM device he received from UCC 1 but through the use of multiple encrypted communication accounts, by taking steps to delete the images from his COVCOM, and transmitting the material through non-conventional means intended to conceal the transmission, more specifically a dynamic website for UCC 1 and a static website for UCC 2.  Despite Schena's best effort to conceal his betrayal of the United States from law enforcement detection, Schena

could not delete all evidence of his ongoing conspiracy with UCC 1 and UCC 2, and evidence of his efforts remained on his COVCOM.

And his efforts to conceal continued until the gig was officially up. When the FBI confronted him with his communications with his co-conspirators, he denied his conduct. When confronted with still images of himself taking photographs of his classified workstation, he still denied his conduct. It was only after the FBI revealed that the still images were retrieved from a surveillance camera that Schena finally admitted to some, but *still* not all, of his conduct. For example, after he began to reveal some of his actions, Schena still denied sending classified information to anyone in October 2024 and further denied taking photographs of classified images prior to February 27, 2025.

Schena only admitted to what he could not deny. The truth was that he intentionally spied for the PRC. Because Schena has not been forthcoming on the full scope of his conduct, the government does not know the extent of his betrayal.

The PRC is a threat to the United States. As noted by the Director of National Intelligence, the PRC, despite being more cautious than other adversaries about risking their economic and diplomatic image, "stands out as the actor most capable of threatening U.S. interests globally," and "presents the most comprehensive and robust military threat to U.S. national security."[7] Moreover, the "counterintelligence and economic espionage efforts emanating from the government of China and the Chinese Communist Party are a grave threat to the economic well-being and democratic values of the United States" and is FBI's top counterintelligence priority.[8]

---

[7] Annual Threat Assessment of the U.S. Intelligence Community (March 2025), available at https://www.dni.gov/files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf

[8] https://www.fbi.gov/investigate/counterintelligence/the-china-threat.

Given the egregious nature and circumstances of the offense, the Court should *not* deviate downwards from the guideline range under § 793 for two reasons.  First, as the PSR noted, there are no factors present in this case that would warrant such a departure.  PSR ¶ 121.  Second, Schena has already obtained a significant benefit through a plea to § 793 instead of § 794.  Schena has admitted to—and the evidence supports a conviction of—delivering national defense information to aid the PRC in violation of 18 U.S.C. § 794.  If he was convicted of § 794, his guideline range of 155 to 181 months' imprisonment would be over *twice* the range that Schena faces here.  If the Court were to vary downwards from the guideline range for § 793, the sentence would be inadequate to reflect the nature and circumstances of Schena's offense.

### 2. Defendant's History and Characteristics

The history and characteristics of Schena also favor a significant sentence.  While Schena, who is currently 42 years old, experienced significant medical issues as a child, his upbringing appears to be better than most of the defendants before the Court.  He grew up in a "decent" neighborhood near Cape Cod, Massachusetts, with his parents and a younger sister.  PSR ¶ 72.  He did well in school, participated in sports, and has remained close with many of his childhood friends.  *Id.* ¶ 73.

Moreover, Schena took advantage of higher education and obtained a secure, well-paying job for the federal government.  Schena obtained a bachelor's degree in 2004 and a master's degree in 2006.  *Id.* ¶ 107.  After earning his degrees, Schena went on to work for the DOS, where he was employed for approximately 18 years.  *Id.* ¶ 111.  Schena also reportedly took many opportunities to further his education by participating in training programs through the Foreign Service Institute and a one-month program in international studies at the Hoover Institution located on the campus of Stanford University and in Washington, D.C. *Id.*  ¶¶ 108-09.

Except for approximately two years, Schena maintained a TOP SECRET security clearance. As a prerequisite to maintaining his clearance, Schena would have been subject to the DOS's annual training, which discusses the appropriate methods of handling of classified information. Smart Decl. ¶ 7. Schena also executed a Classified Information Nondisclosure Agreement in which Schena "acknowledged having been advised that any unauthorized disclosure, unauthorized retention, or negligent handling of classified information could cause damage or irreparable injury to the United States." *Id.* ¶ 8. In the same agreement, Schena agreed to "never divulge classified information to anyone unless" he has "officially verified that the recipient has been properly authorized" by the government to receive the information or he was given "written notice of authorization." *Id*.

Schena had the upbringing, education, experience, and security clearance for a long career in the federal government. But despite his agreement and training at the DOS on the handling of classified information, Schena spied for one of our largest adversaries and put his country's national security in danger of serious damage. His history weighs in favor of significant punishment, not leniency.

### 3. Just Punishment, Seriousness of the Offense, and Respect for the Law

As the Supreme Court has noted, "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (citations omitted). And "[e]spionage is one of this nation's most serious offenses." *United States v. Whitworth*, 856 F.2d 1268, 1289 (9th Cir. 1988). It is a betrayal of America and its people, and it often puts lives at risk.

Schena repeatedly violated his duty to this country when he escalated from providing unclassified material to SBU material to transmitting multiple documents classified at the SECRET level containing national defense information. As Schena agreed in his Statement of

Facts, since at least April 2022 he has been providing people, whom he met online, with information they were not entitled to receive in return for personal financial gains. ECF No. 52 ¶ 28. Showing a total disregard with the handling of SBU information, which poses a lower risk to the United States than material classified as SECRET, Schena bypassed DOS classification warnings in February 2025 to forward SBU material from his DOS-issued work computer to his personal email account. During his post-arrest interview, he nonchalantly stated he would disclose "SBU when appropriate" to UCC 1 and UCC 2. Ex. E at 1:42:00. But there are no circumstances where it would be appropriate to share material classified as SBU to someone unauthorized to receive the material—especially a PRC handler—in exchange for money.

The risks to which he subjected the country only increased in severity as he escalated from the unauthorized disclosure of unclassified material to SBU to Secret-level documents. Through his actions, Schena has potentially harmed DOD's ability to conduct intelligence operations and DOS's ability to conduct foreign relations. Schena also potentially jeopardized the safety of human sources who provide invaluable information to the United States and chilled the exchange of information with our foreign partners.

Notably, the declarations submitted by DAS Kootz and DDI Dixson do not consider that Schena disclosed classified information to the PRC, one of the United States's most significant adversaries. Schena's conduct poses a much greater risk to the national security of the United States because he sent it to this hostile nation.

### 4. The Need for Adequate Deterrence and Protecting the Public

The Court must consider both general deterrence for the public at large and specific deterrence as to Schena.

Regarding general deterrence, this Court sits in the jurisdiction with one of the highest—if not the highest—numbers of security clearance holders and classified documents in the country.

Northern Virginia is awash in federal employees who are entrusted to protect this nation's secrets, and it is home to numerous federal agencies that rely on classified information to protect this country.

The Eastern District of Virginia's large number of clearance holders also means that this area is a prime target for China to identify and target individuals as human sources. Unfortunately, Schena's case is one of multiple cases that follow a similar fact pattern of PRC recruitment. Despite public warning from the FBI, *see supra* at 4, individuals like Schena continue to sign up to serve as human sources for the PRC. Therefore, it is imperative that the Court send a message to clearance holders across the country—and especially those who work or reside in the Eastern District of Virginia—that "espionage is one of this nation's most serious offenses," *Whitworth*, 856 F.2d at 1289, and will be punished accordingly. A sentence at the high end of the guideline range does just that. But a sentence at the low end of the guideline range—or below the guideline range—sends the wrong message: that individuals who betray the United States face minimal consequences.

Regarding specific deterrence for Schena, the Court should consider that Schena's purported motive—money—will likely follow him when he is finished with his term of imprisonment. Under the terms of the plea agreement, he has lost his pension, and as a convicted spy, he will be unable to return to his career in the federal government. Therefore, Schena's financial condition will likely be worse after his term of imprisonment than before he was arrested. His risk of recidivism, therefore, may increase upon release.

While Schena no longer maintains an active security clearance and will likely never receive another security clearance, Schena maintains sensitive and non-public national defense information retained after 18 years of service at the DOS. Moreover, he maintains the sensitive

23

information about how he was caught. Schena will continue to pose a risk of selling classified or otherwise sensitive information for the foreseeable future. And this risk is not merely hypothetical. The information that Schena maintains continues to be relevant to a foreign adversary. Indeed, a spy convicted in the Eastern District of Virgina was subsequently convicted of acting as an agent of Russia when he attempted to transmit information about how he was caught by the FBI to the Russians. *See United States v. Nicholson*, 3:09-CR-40 (D. Or.).[9] Therefore, the Court must provide a significant cost to Schena to deter him from making the same mistake twice.

## 5. Avoid Unwarranted Sentencing Disparities

The Government's recommended sentence appropriately measures Schena's culpability considering comparable cases under the Espionage Act. Under 18 U.S.C. § 3553(a)(6), the Court should consider cases *nationally*, not just cases within the Eastern District of Virginia. *United States v. Fry*, 792 F.3d 884, 892 (8th Cir. 2015) (collecting cases). Generally, by starting with the guideline range, "the district court necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities." *United States v. Sueiro*, 59 F.4th 132, 141-42 (4th Cir. 2023) (citing *Gall*, 552 U.S. at 54) (quotations omitted). And "[t]he requirement of procedural reasonableness does not obligate a trial court to engage in case-by-case comparisons of sentences imposed in cases unconnected to the case before the court." *Id*. at 142. The government highlights the following cases as points of reference for the Court.

Schena's case is analogous, although more serious, to that of Korbein Schultz. *United States v. Schultz,* 3:24-CR-00056 (M.D. Tn.). Schultz was a U.S. Army intelligence analyst who

---

[9] Nicholson was sentenced to 283 months' imprisonment for his 1997 espionage conviction in the Eastern District of Virginia and to 96 months' imprisonment for the subsequent conduct of trying to send additional information to the Russians while he was incarcerated in Oregon. *See* https://www.justice.gov/archives/opa/pr/imprisoned-spy-sentenced-8-more-years-conspiracy-act-agent-russian-government-and-money.

conspired with an individual he knew to be residing in Hong Kong to gather and transmit national defense information.  Schultz ultimately provided his co-conspirator with dozens of sensitive documents, including documents related to China and its military, technical, and operational information about American weapons systems, U.S. military assessments of the Chinese military, U.S. military deployments, and how lessons from the Ukraine/Russia war could be applied to the defense of Taiwan.  Although Schultz conspired with his Chinese handler to gather and transmit classified information, the government did not have any evidence that Schultz successfully transmitted classified documents to his co-conspirator.  Schultz pleaded guilty to, *inter alia*, conspiracy to gather and transmit national defense information, in violation of 18 U.S.C. § 793(g), and the Court sentenced Schultz to 84 months' imprisonment.[10]

Like Schultz, Schena conspired with PRC government officials.  And, like Schultz, Schena was paid for his efforts to collect and transmit national defense information. But Schultz only transmitted *unclassified* national defense information to his handlers.  Schena, on the other hand, successful transmitted *classified* national defense information, which is an order of magnitude more serious, as defined by law.

Schena's case is more analogous to that of defendant Kevin Mallory.  *United States v. Mallory,* 1:17-cr-00514 (E.D. Va.)  Mallory was convicted of, 18 U.S.C. § 794, which prohibits the delivery or attempted delivery of national defense information to a foreign government with the specific intent to harm the United States or aid a foreign power or reason to believe it would do so.  Mallory, a former covert case officer for the CIA and former senior intelligence officer for

---

[10] Schultz also pleaded guilty to three counts of export of technical data related to defense articles to the PRC without a license, in violations of 22 U.S.C. § 2778(b)(2) and (c) (the "Arms Export Control Act" or "AECA"), 22 C.F.R. §§ 121.1, 127.1, and 127.3 (the "International Traffic in Arms Regulations" or "ITAR"), and 18 U.S.C. §201(b)(2)(C) (Bribery).

the DIA, passed TOP SECRET classified, national defense information in exchange for financial gain.  Similar to Mallory, Schena engaged with individuals he believed were likely members of PRCIS.  And like Mallory, Schena received a COVCOM from his handler and also received a large sum of cash while overseas.[11]  Unlike Mallory, Schena gathered and transmitted *recently* drafted SECRET material rather than digitizing TOP SECRET documents unlawfully removed and retained from a prior employment. Mallory was convicted after a jury trial of 18 U.S.C. § 794, and the Court sentenced Mallory to 240 months' imprisonment.

In another example, *United States v. Dalke,* Case No. 1:22-cr-00313 (D. Colo.), Jareh Sebastian Dalke, an employee of the National Security Agency, attempted to pass national defense information, which was classified as TOP SECRET, to someone he believed was a Russian agent. Fortunately for America, Dalke was passing information to an undercover FBI agent.  Dalke pleaded guilty to violating 18 U.S.C. § 794 and was sentenced to 262 months' imprisonment. Similar to Dalke, Schena was a clearance holder who was trained and obligated to not disclose classified material to unauthorized individuals.  Similar to Dalke, Schena gathered and prepared multiple classified documents containing national defense information for transmission. However, unlike Dalke, Schena *successfully* transmitted national defense information to someone likely affiliated with a foreign government, not an undercover FBI agent.

On the other hand, other § 793 cases that involve defendants *not* similarly situated can aid the Court by showing how much more serious Schena's conduct was.  In *United States v. Rahman*, 1:24-CR-249 (E.D. Va.), for example, Rahman was a former CIA analyst who transmitted multiple TOP SECRET documents to individuals who were not entitled to receive them.  He pleaded guilty

---

[11] During the course of two trips to the PRC, Mallory accepted $25,000 in a case, in addition to airfare, accommodation, and incidentals.

to two counts of 18 U.S.C. § 793(e) and received a sentence of 37 months on each count to run concurrently. Rahman's conviction differs from Schena's conduct in two critical ways.

First, Rahman was convicted of unlawfully transmitting classified information to someone who was not authorized to receive it. But Schena is convicted of conspiring with, and transmitting classified information to, a hostile foreign government. In other words, Schena was committing classic espionage for a foreign adversary, while Rahman was convicted of leaking documents. While both are violations of the Espionage Act, Schena's conduct should be punished more severely than Rahman's because of Schena's deliberate actions to undermine the national security of the United States. Rahman's conduct *risked* the nation's enemies accessing classified information; Schena's *ensured* it.

Second, Rahman cooperated with the government (including multiple debriefs, initiated by Rahman, with the government); Schena did not. The court in Rahman rejected the government's request for a single point reduction under § 5K1.1 for his substantial assistance and, instead, reduced Rahman's offense level by five points, bringing his guideline range far lower than Schena's. Here, there is no basis to lower Schena's guidelines range, and no basis to depart from that range.

Comparing Schena's actions against the backdrop of recent prosecutions under the Espionage Act, the Government's recommendation to sentence Schena at the high end of the guidelines range is justified given the specifics of Schena's conduct and would not create an unwarranted sentencing disparity.

\* \* \* \* \*

In addition to a term of imprisonment of 87 months, the government recommends a three-year term of supervised release, including the four special conditions proposed by the Probation

Office.  PSR ¶¶ 20-21.  The term of supervised release will ensure that Schena can obtain any necessary counseling and treatment during his transition from incarceration.  Likewise, the Probation Office can ensure that Schena does not pose a risk of recidivism if he faces financial issues.  The special conditions will assist the Probation Office in that endeavor by providing Schena with treatment when needed, providing insight into his financial state, and permitting the Probation Office to have insight into his online activities, which is the forum where he communicated with his PRC handlers.

## CONCLUSION

Balancing Schena's egregious conduct with his swift guilty plea, a sentence at the high end of the sentencing guidelines range will adequately capture the full extent of the Section 3553(a) factors and appropriately reflect the seriousness of the offense and the exceptionally grave risk of harm Schena created for this country and its citizens.

Respectfully submitted,
Erik S. Siebert
UNITED STATES ATTORNEY


_____/s/_____
Michael P. Ben'Ary
Assistant United States Attorneys
U.S. Attorney's Office, EDVA
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-2100
michael.benary@usdoj.gov

Maria Fedor
Trial Attorney
National Security Division, CES

28